**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHURCHES OF CHRIST IN CHRISTIAN UNION,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. C2-07-CV-1186** |
| **v.** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **EVANGELICAL BENEFIT TRUST, ET AL.,** | : | |
| | : | **Magistrate Judge Kemp** |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

## I. INTRODUCTION

This matter is before the Court on the Cross Motions for Summary Judgment of Plaintiff Churches of Christ in Christian Union ("CCCU") and Defendants Evangelical Benefit Trust ("EBT"), Medical Benefits Administrators of MD, Inc. ("MBA"), Ronald J. Wilson ("Ronald Wilson"), R.J. Wilson & Associates Ltd. ("R.J. Wilson"), P. Gene Hood ("Hood"), Andrew J. Phipps ("Phipps"), and Brady Duren ("Duren"). The Defendants move for summary judgment on all claims alleged in Plaintiff's Complaint and EBT's Counterclaim. The Plaintiff moves for summary judgment on all claims alleged in EBT's Counterclaim. This matter is also before the Court on Defendants' Motion to Strike Affidavits and Motion to Strike Unauthenticated Exhibits. For the reasons set forth below, the Court: (1) **DENIES** Defendants' Motion to Strike Affidavits; (2) **DENIES** Defendants' Motion to Strike Unauthenticated Exhibits; (3) **DENIES** Defendants' Motion for Summary Judgment; and (4) **DENIES** Plaintiff's Motion for Summary Judgment.

## II. BACKGROUND

### A. PARTIES

CCCU is a nonprofit corporation Christian denomination comprised of a Headquarters in Circleville, Ohio; the Ohio Christian University (the "University") in Circleville, Ohio; three grade schools in greater Columbus, Ohio; and approximately 200 individual churches spread throughout Ohio and many other states. CCCU is guided by a board of trustees, a general superintendent, and other administrative personnel.

EBT is a trust established by the Evangelical Society of Churches, Inc. to provide health and welfare to eligible employees and dependents of members of that Society. MBA is the plan administrator for EBT. Hood, Phipps, and Duren are trustees of EBT. R.J. Wilson is a broker that procured insurance for the benefit of EBT. Ronald Wilson is an officer and principal of MBA and R.J. Wilson.

### B. SOLICITATION AND REQUEST FOR QUOTE

In early 2005, CCCU was solicited by Garry Wilson ("Wilson") of R.J. Wilson for participation in EBT. EBT's solicitation consisted of at least three meetings held on: March 18, 2005; September 14, 2005; and September 21, 2005. In addition, Mark W. Taylor ("Taylor"), then the General Treasurer of CCCU who was responsible for obtaining medical coverage for eligible CCCU members, had several telephone conferences with Wilson and exchanged emails and faxes with him. CCCU asserts it provided voluminous information to Wilson during the solicitation period, including a copy of the CCCU 2005 Yearbook that contains a comprehensive list of all employees and ministers within CCCU.

During the solicitation period, CCCU was provided with an EBT Quote Sheet, which

states, in pertinent part:

> The rates are conditional upon enrollment of at least 70% of all eligible employees. Eligible employees are full time (at least 24 hours per week) permanent employees not covered under a spouse's health plan or under contract.

(*Id.* p. 1.) CCCU asserts that it was never informed that 70 percent of the ministers within the denomination, even if they were not compensated by CCCU, would have to participate in the EBT plan in order for CCCU to obtain coverage. CCCU asserts that had this information been communicated, discussions with EBT would have been terminated because, "CCCU was never in a position to provide coverage for 70% of all our ministers." (Dr. Daniel Tipton aff. ¶ 6.)

Dr. Daniel Tipton ("Tipton"), then the General Superintendent for the CCCU Headquarters, claims it was "made very clear to Mr. Wilson that CCCU had approximately 200 churches and that CCCU was not seeking medical coverage for some 300 or so of our ministers." (*Id.* ¶ 5.) Taylor contends that during his communications with Wilson, he told Wilson "CCCU was not seeking coverage for the many pastors associated with the churches that did not provide coverage for their pastors." (Taylor aff. ¶ 4.) Taylor also contends that during a meeting with Wilson in Tipton's office, Tipton and Taylor

> made clear that, although CCCU was comprised of many churches, we were seeking coverage from EBT for only the employees of the General Headquarters, the University, our three schools . . . and those pastors and employees associated with churches that provided coverage for their pastors and employees. We also communication to Wilson that well less than 50% of the churches provided coverage for their pastors and employees.

(*Id.* ¶ 5.)

On or about October 12, 2005, Taylor submitted a Request for Quote to MBA on behalf of CCCU. The Request for Quote form states, in pertinent part:

> The foregoing information is intended to help underwriters develop coverage and

appropriate rates for your group insurance. This form must be completed by an individual within your company who knows, or can obtain the information requested. An officer of the company must certify, to the best of that officer's knowledge, that the information provided is true and accurate.

(*Id*. p. 2.) Taylor testified he was told by Wilson to do his "best guess, best estimate" of the number of employees CCCU had. (Taylor depo. p. 61.) Taylor submitted in the Request for Quote that as of October 2005, CCCU had 150 full-time employees and 100 part-time employees. (*Id*. p. 1.)

## C. APPLICATION AGREEMENT

On October 28, 2005, Wilson met with Taylor at the Welcome Center at the University to enroll CCCU members for participation in EBT.[1] Taylor executed an Employer Participation Application and Participation Agreement [together referred to as the "Application Agreement"] on behalf of CCCU. The Application Agreement states that EBT "will rely on this statement and all of the information set forth herein as a basis for approving [y]our organization's application for participation under the [EBT]." (*Id*. p. 2.) Taylor submitted in the Application Agreement that CCCU had 120 full-time and 30 part-time employees. (*Id*. p. 1.) These numbers, which were lower than the previous 150 full-time and 100 part-time employee numbers provided in the Request for Quote, more closely approximated the actual number of members who were eligible for coverage.

An August 2007 audit showed that in October 2005, the total number of full-time employees was 196. These 196 members were composed of three groups who received insurance coverage through CCCU: (1) full-time employees of CCCU Headquarters, the University, and

---

[1]Prior to CCCU enrolling, most EBT participants had been single, stand-alone churches. CCCU was the "first large EBT case" sold by an EBT agent. (McClarrie Email, Nov. 1, 2005.)

the three schools; (2) full-time evangelists; and (3) full-time ministers and staff associated with individual churches that provided their ministers and staff with medical coverage. Of the 196 full-time employees, 19 were classified by CCCU as retired because they were receiving medical coverage through Medicare or the U.S. military, and 62 others were receiving medical coverage through their spouses. This resulted in 115 eligible full-time employees. There were also 38 part-time employees, employed either at CCCU Headquarters, the University, or one of the three schools. These numbers were very close to the numbers provided by CCCU in its Application Agreement: 120 full-time employees and 30 part-time employees. The August 2007 audit also showed, however, that there were 282 part-time employees when ministers associated with all the individual churches were included in the part-time employee tabulation.

EBT asserts that it relied on CCCU's misrepresentations in its Application Agreement in determining CCCU's eligibility to participate in EBT and in calculating CCCU's plan contribution rate and monthly contributions. Monthly contributions of CCCU were based on the total number of eligible participants. The Application Agreement provides, in pertinent part:

> We [CCCU] agree to remit to [EBT] monthly in advance the required employer/employee contribution for all persons who are eligible for benefits as described in the Summary Plan Description . . . Contributions shall include charges for ministers and their covered dependents; employees and their covered dependents; and early retirees and their covered dependents.

(*Id*. p. 2.)

In general, part-time employees were not considered eligible employees for coverage, so how many part-time employees a company had was usually irrelevant for determining eligibility and calculating contribution rates. Pursuant to the SPD, however, part-time ministers were considered eligible employees. CCCU did not report that it had 282 part-time employees because

it did not count ministers associated with the individual churches. CCCU only reported the number of part-time employees that were compensated by CCCU. Because CCCU reported it had only 120 full-time and 30 part-time employees, its contributions were lower than if it had reported it had 282 part-time employees.[2] Furthermore, because CCCU underreported the number of eligible employees it had, CCCU needed significantly less of its members to participate in the plan in order to be eligible with EBT.

According to CCCU, none of the documents presented to CCCU prior to enrolling in EBT provided notice that CCCU was obligated to disclose information about its ministers. CCCU asserts the documents at issue only required disclosure of full-time and part-time "employees," which CCCU assumed to mean employees formally employed by and compensated by CCCU.

The Summary Plan Description ("SPD") provides information to plan participants about what they can expect in terms of coverage. The SPD has a section entitled "Eligibility" that lists Eligible Classes of persons who can get coverage. (*Id*. 11.) The two Eligible Classes are employees and dependents. (*Id*.) Employees are described as ministers, employees, and separate employees. (*Id*.) For ministers, the SPD states:

> Any duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry, who: a) upon entry into the Plan was at that time active with a participating member church entity, regardless of the source of his or her compensation; b) is a member in good standing of the Evangelical Society of Churches Inc.; c) [ ] has not reached the attained age of 65 years old; shall be

---

[2]It has not been established whether all of those part-time ministers were eligible employees. For instance, as with full-time employees, if a part-time minister was receiving medical coverage through his spouse, he would not be counted in the list of eligible employees. (*See* Application Agreement p. 1) ("'Eligible' does not include EEs covered elsewhere by spouse.").

deemed to be an eligible Employee under the Plan.

(*Id*.) According to CCCU, and undisputed by Defendants, the SPD was not provided to CCCU prior to enrollment in EBT. The SPD was provided to CCCU after enrollment.

## B. PROCEDURAL HISTORY

On November 11, 2007, CCCU brought this suit against Defendants.[3] CCCU asserts three causes of action in its Complaint, all of which arise out of EBT's refusal to pay claims of approximately $577,000 submitted by CCCU employees after EBT discovered CCCU's alleged misrepresentations in its Request for Quote and in its Application Agreement. In its first cause of action, CCCU asserts breach of contract against EBT and MBA. In its second cause of action, CCCU asserts breach of fiduciary duty against all Defendants. In its third cause of action, CCCU asserts a claim for bad faith refusal to pay its claims against all Defendants.

On January 9, 2008, Defendants submitted their Amended Answer to Complaint and EBT filed a Counterclaim against CCCU. EBT's Counterclaim is similarly premised on CCCU's alleged misrepresentations regarding the number of its employees. In its Counterclaim, EBT asserts three causes of action. In its first cause of action, EBT seeks rescission of CCCU's participation in the EBT plan. In its second cause of action, EBT asserts fraud by CCCU in connection with its Application Agreement. In its third cause of action, EBT asserts breach of contract based on CCCU's failure to remit plan contributions to EBT for all persons eligible for benefits under the SPD.

Defendants seek summary judgment on Plaintiff's claims and EBT's counterclaims. Plaintiff seeks summary judgment on EBT's counterclaims.

---

[3]One of the original Defendants, Lloyd's of London, has been dismissed in this case.

# III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). But the non-moving party "may not rely merely on allegations or denials in its own pleading." Fed. R. Civ. P.56(e)(2); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991).

> The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts . . . Rather, the court must evaluate each party's motion on its own merits . . .

*Id.* (citations omitted).

## IV. LAW & ANALYSIS

## A. MOTIONS TO STRIKE

Defendants move to strike allegedly unauthenticated exhibits from Plaintiff's Motion for Summary Judgment and Memorandum in Opposition to Defendants' Motion for Summary Judgment ("CCCU's MSJ"). Defendants also move to strike the affidavits of Tipton, Taylor, and Becky Hux ("Hux").

### 1. Unauthenticated Exhibits

Defendants assert that certain exhibits filed in support of CCCU's MSJ are not marked for identification purposes, are not properly authenticated, and do not contain admissible evidence as required by Rule 56(e) of the Federal Rules of Civil Procedure. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). All the exhibits are identifiable. Therefore, the issue is whether they have been authenticated. Defendants contend that the following are unauthenticated: Exhibits 2, 3, 6A, 6B, 13, 14, 15, 16, 18, 19, 20A, 20B, 20C, and 21.

#### a. Curing Through Supplemental Affidavits: Exhibits 2, 3, 13, 14, and 15

CCCU has submitted supplemental affidavits by Tipton, Crabtree, and Taylor, submitted as Exhibits 22, 23, and 24, to cure any issues of authentication for Exhibits 2, 3, 13, 14, and 15. Exhibits 2 and 3 are authenticated in Exhibit 22; Exhibits 13 and 14 are authenticated in Exhibit 23; and Exhibit 15 is authenticated in Exhibit 24.

#### b. Self-Authenticating: Exhibits 6A, 6B, 16, 18, 19, 20A, 20B, 20C, and 21

Exhibits 6A, 6B, 16, 18, 19, 20A, 20B, 20C, and 21 were drafted by and produced by

Defendants. The issue in authentication is whether "the document is what it purports to be."

*Kleenit, Inv. v. Sentry Ins. Co.*, 486 F.Supp.2d 121, 130 (D. Mass. 2007).

> We have repeatedly noted that "[t]he burden of proof for authentication is slight." . . . In *Link*, we elaborated on the standard for authentication of documents: [T]he showing of authenticity is not on a par with more technical evidentiary rules, such as hearsay exceptions, governing admissibility. Rather, there need be only a prima facie showing, to the court, of authenticity, not a full argument on admissibility. Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court. The only requirement is that there has been substantial evidence from which they could infer that the document was authentic.

*Lexington Ins. Co. v. W. Pennsylvania Hosp.*, 423 F.3d 318, 328-29 (3d Cir. 2005) (quoting *Link v. Mercedes-Benz of N. America*, 788 F.2d 918, 927 (3d Cir. 1986)). Where a document is produced in discovery, "there [is] sufficient circumstantial evidence to support its authenticity" at trial. *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1423 (10th Cir. 1991). In *U.S. v. Cinergy Corp.*, 495 F.Supp.2d 909 (S.D. Ind. 2007) the court found that for summary judgment purposes, "it is disingenuous for Cinergy to object to copies of documents that it produced to Plaintiffs pursuant to discovery requests." *Id.* at 914; *see Architectural Iron Workers Local No. 63 Welfare Fund v. United Contractors, Inc.*, 46 F.Supp.2d 769, 772 (N.D. Ill. 1989) (finding "documents produced in response to discovery are self-authenticating . . . there is no error to admit as evidence documents that Defendants themselves possess and produced in response to Plaintiff's requests for production of documents") (internal citations omitted).

Exhibits 6A, 6B, 16, 18, 19, 20A, 20B, 20C, and 21 were all created by Defendants and were all produced in response to discovery requests. Furthermore, CCCU has submitted as Exhibit 25 an affidavit from its counsel that these exhibits are true and correct copies of the documents produced by Defendants. These exhibits are self-authenticating and therefore,

admissible. Defendants' Motion to Strike Unauthenticated Exhibits is **DENIED**.

## 2. Affidavits

Defendants assert that the affidavits of Tipton, Taylor, and Hux that CCCU has filed in support of CCCU's MSJ must be stricken as: (1) contrary to CCCU's sworn interrogatory responses; (2) contrary to CCCU's prior sworn deposition testimony in this case; and/or (3) utterly immaterial to the issues before the Court on summary judgment.

### a. Tipton Affidavit

In Tipton's affidavit, he describes a meeting that he had with Wilson and other CCCU representatives in which Tipton avers he made clear to Wilson that "CCCU was seeking insurance for a limited number of members, perhaps 90-100, out of a pool of 150 people at most." (Tipton aff. ¶ 5.) Tipton also asserts in his affidavit that "it was made very clear to Mr. Wilson" at that meeting "that CCCU had approximately 200 churches and that CCCU was not seeking medical coverage for some 300 or so of [its] ministers." (*Id.*)

Defendants contend that Tipton's recollection of what occurred during a meeting with Wilson cannot be reconciled with CCCU's response to Interrogatory 6. Interrogatory 6 asked CCCU to "[d]escribe in detail all communications between CCCU and any Defendant concerning the total number of CCCU's employees eligible for health and welfare benefits through EBT, including the date of such communications and persons involved." CCCU's sworn Response to Interrogatory 6 states:

> discussions regarding eligible employees have involved Garry Wilson of EBT; CCCU's Board of Trustees executive committee (Don Spurgeon (deceased), Dan Tipton, Ron Reese and Dan Harrison); Becky Hux, Mark Taylor and Bruce Crabtree. These communications occurred during Mr. Wilson's meeting with the Board in June 2005, in Mr. Taylor's communications regarding eligible employees provided to EBT in August 2005 and October 2005, as well as through

e-mail and phone communication between Mark Taylor and/or Bruce Crabtree and EBT/MBA throughout 2005 until the inception of this lawsuit.

After receiving CCCU's interrogatory responses, Defendants challenged Response to Interrogatory 6, asserting:

Although the interrogatory identifies individuals who presumably had communications regarding the subject of this Interrogatory, the Answer utterly fails to describe in any detail the substance of those communications. Please amend the Answer to provide the substance of those communications.

(Letter of Defendants' counsel, July 30, 2008.) CCCU's counsel responded that the type of information sought by Defendants should be solicited by deposition:

. . . I will reiterate now, that my client's responses to the interrogatories are complete, and further, any additional explanation or information you feel is needed would potentially be appropriate subject matter during the upcoming depositions of Mr. Taylor and Mr. Crabtree.

(Email of Plaintiff's counsel, August 11, 2008.)

The rule is well settled that "[a]fter a motion for summary judgment has been made a party may not create a factual issue by filing an affidavit contradicting his earlier statements." *In re Greenfield*, 65 F. App'x 549, 553 (6th Cir. 2003). In *Aeral, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899 (6th Cir. 2006), the Sixth Circuit developed a two part inquiry for determining whether a party's affidavit submitted at the summary judgment stage should be considered. First, the court must determine whether the affidavit directly contradicts the party's prior sworn statements. *See id.* at 908. Indeed, "[a] directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id*. Second, if there is no direct contradiction, the court must determine whether the affidavit "constitutes an attempt to create a sham fact issue." *Id*.

The Court finds that Tipton's affidavit does not directly contradict CCCU's prior

interrogatory responses. The interrogatory disclosed that there were discussions regarding eligible employees that involved Wilson and Tipton. Defendants failed to depose Tipton, so there is no prior deposition testimony with which the affidavit could contradict. The Court also finds there is no indication that this was an attempt to create a sham fact issue. Neither CCCU nor Tipton were ever specifically questioned about Tipton's conversations with Wilson. It is understandable, therefore, that Tipton would now offer an affidavit to relay the contents of those conversations. This affidavit is also material to the issues before the Court on summary judgment, so it will not be stricken on that basis.

### b. Taylor Affidavit

In Taylor's affidavit, he identifies several personal meetings he had with Garry Wilson on March 18, 2005, September 14, 2005, September 21, 2005, and October 27, 2005. (Taylor aff. ¶ 2.) Defendants again complain that CCCU did not mention any of these alleged meetings in response to Defendants' Interrogatory 6. The Court finds that Interrogatory 6 disclosed these meetings generally, and therefore, the affidavit is not directly contradictory. The Court likewise finds that the affidavit is not inconsistent with any portion of Taylor's deposition testimony. He was not questioned about the dates of meetings he had with Wilson, nor was he questioned about what he communicated to Wilson regarding eligible employees of CCCU during those meetings or during telephone calls and emails. Because Defendants failed to question Taylor at his deposition about what he communicated to Wilson regarding eligible employees of CCCU, it is understandable that Taylor would now offer an affidavit to relay the contents of those conversations. The Court does not find any portion of Taylor's affidavit to be inconsistent with his deposition. This affidavit is also material to the issues before the Court on summary

judgment, so it will not be stricken on that basis.

### c. Hux Affidavit

Defendants object to Hux's affidavit because it "merely . . . corroborates Dr. Tipton's and Mr. Taylor's recollection of a March 18, 2005 meeting with Garry Wilson of EBT." (Motion to Strike Affidavits p. 7.) Defendants assert, therefore, that Hux's affidavit is entirely immaterial to the issues before the Court on summary judgment.

The Rules of Evidence do not render statements inadmissible simply because they corroborate another witness' testimony. Furthermore, the Court finds Hux's affidavit is material to the issues before the Court on summary judgment, so it will not be stricken.

Therefore, Defendants' Motion to Strike Affidavits of Tipton, Taylor, and Hux is **DENIED**.

### B. MOTIONS FOR SUMMARY JUDGMENT

Defendants seek summary judgment on CCCU's claims for breach of contract, breach of fiduciary duty, and bad faith. EBT and CCCU both seek summary judgment on EBT's counterclaims for rescission, fraud, and breach of contract.

### 1. CCCU's Claims

Defendants assert that all three of CCCU's causes of action are premised on its alleged right to participate in EBT by meeting the eligibility requirements. Thus, Defendants contend, if CCCU misrepresented its eligibility to participate in EBT by making material misrepresentations in the Application Agreement, it is axiomatic that CCCU's causes of action for breach of

contract, breach of fiduciary duty[4], and bad faith[5] must fail.

The relevant Ohio statute provides as follows:

The falsity of any statement in the application for any policy of sickness and accident insurance shall not bar the right to recovery thereunder, or be used in evidence at any trial to recover upon such policy, **unless it is clearly shown** that such statement is **willfully false**, that it was **fraudulently made**, that it **materially affects** either the acceptance of the risk or hazard assumed by the insurer, that it **induced** the insurer to issue the policy, and that **but for** such false statement the policy would not have been issued.

Ohio Rev. Code § 3923.14 (emphasis added). For purposes of their summary judgment motion,

Defendants accept the applicability of this insurance statue, and assert they should be granted

summary judgment because all of the elements of the statute are clearly present in this case.

(Defendants' Motion for Summary Judgment ("Defendants' MSJ") p. 11.)

For relief to be granted under Ohio Rev. Code § 3923.14, "each of the elements

contained within the statute must be shown by clear and convincing evidence." *Martin v. Mike*

*Lovasz Agency*, No. 2002-L-171, 2004 WL 457298, at *2 (Ohio Ct. App. Mar. 12, 2004).

Clear and convincing is that degree of proof which is more than a mere preponderance, but does not rise to the level of certainty required beyond a reasonable doubt in the criminal context. Rather, it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.

*Id.*

---

[4]CCCU alleges for the breach of fiduciary claim "[h]aving wrongfully failed to pay the claims made by members of the CCCU, defendants have breached their fiduciary duty to CCCU." (Complaint ¶ 29.) Defendants' refusal to pay CCCU's members' claims would only have been "wrongful," if CCCU was eligible to participate in EBT.

[5]Under Ohio law, the duty of good faith "depends upon the language of the contract in each case which leads to an evaluation of reasonable expectations of the parties." *Fulz & Thatcher v. Burrows Group Corp.*, No. CA2005-11-126, 2006 WL 3833971, at *6 (Ohio Ct. App. Dec. 26, 2006).

The primary elements at issue are whether the representations were willfully false and whether they were fraudulently made. CCCU asserts that in the four documents it received from Defendants prior to enrollment—two Quote Sheets, the Request for Quote Sheet, and the Application Agreement Sheet—those documents mentioned and asked for information about employees and employees only. None of those documents defined "employees" to include "ministers" or stated that the number of ministers associated with CCCU had to be disclosed. The Application Agreement had blank spaces next to the words "full time employees" and "part time employees." (*Id.* p. 1.) It did not state that ministers who were not directly employed by CCCU or compensated by CCCU were to be included in those tabulations, and it did not contain a separate blank to list the number of ministers associated with CCCU.

The Application Agreement states, "We agree to remit to [EBT] monthly in advance the required monthly employer/employee contributions for all persons who are eligible for benefits as described in the [SPD]." (*Id.* p. 2.) No one at CCCU, however, recalls receiving the SPD before submitting the Application Agreement. Defendants do not dispute this fact. The SPD provides information to plan participants about what they can expect in terms of coverage and is the only document that defines "employee" to include "ministers." The SPD has a section entitled "Eligibility" that lists Eligible Classes of persons who can get coverage. (*Id.* p. 11.) The two Eligible Classes are employees and dependents. (*Id.*) Employees are described as ministers, employees, and separate employees. (*Id.*) Ministers are described as eligible under the plan "regardless of the source of his or her compensation." *(Id.*) It is apparent from the SPD that ministers were eligible for coverage with EBT even if CCCU was not compensating them, and even if they were working part-time.

Defendants assert, therefore, that CCCU should have included the number of ministers in its employee disclosures in the Application Agreement. Defendants buttress this assertion with the fact that the Application Agreement states, "[c]ontributions shall include charges for ministers . . ." (*Id.* p. 2.) Furthermore, Wilson testified, "One of the key selling factors of the EBT plan is that it covered pastors whether they are gainfully employed by a church or not." (Wilson depo. pp. 58-59; p. 99.) If this information was communicated to CCCU as a "key selling factor" then CCCU should have known the importance of disclosing the number of ministers on the Application Agreement even if there was not a blank space for the number of ministers. Defendants contend that regardless of the specific "blanks" on the Application Agreement, CCCU knew the importance of disclosing ministers and was not forthright and up front about everyone in their group.

CCCU contends, however, that in responding to Defendants' questions about employees, without having been provided with the SPD, CCCU was left to define the term "employees" in the typical sense used by an employer—persons who receive compensation. Because the large majority of CCCU ministers were not compensated by CCCU, CCCU did not count those ministers in its employee tabulation. CCCU claims that nowhere and at no time did Defendants ask about CCCU's many ministers. CCCU also claims that Tipton and Taylor disclosed to Wilson that CCCU had approximately 200 churches and did not provide coverage, nor was it seeking coverage, for some 300 or so of their ministers. (*See* Taylor aff. ¶ 4; Tipton aff. ¶ 5.) Specifically, Taylor claims that he told Wilson that though CCCU was comprised of many churches, "we were seeking coverage from EBT for only the employees of the General Headquarters, the University, our three schools . . . and those pastors and employees associated

with churches that provided coverage for their pastors and employees." (Taylor aff. ¶ 5.)

Based on the evidence presented, a jury could find that CCCU knew that it needed to disclose everyone who was in CCCU's group and intentionally omitted material information on the Application Agreement. A jury could also find, however, that any omission of ministers on the Application Agreement was simply because CCCU did not know or understand that ministers should be included. Defendants have not clearly proved that the representations of CCCU were willfully false or fraudulently made. Therefore, Defendants' motion for summary judgment on CCCU's breach of contract claim, breach of fiduciary duty claim, and bad faith claim is **DENIED**.

### 2. EBT's Counterclaims

EBT and CCCU both seek summary judgment on EBT's counterclaims for rescission, fraud, and breach of contract.

### a. Rescission

EBT must prove the necessary elements of Ohio Rev. Code § 3923.14 to be able to rescind CCCU's health insurance contract and deny benefits. *Davies v. Centennial Life Ins. Co.*, 128 F.3d 934, 939 (6th Cir. 1997). As stated above, EBT has not "clearly proved" all five elements, so EBT's motion for summary judgment on EBT's rescission claim is **DENIED**. *See Buemi v. Mutual of Omaha Ins. Co.*, 524 N.E.2d 183, 187 (Ohio Ct. App. 1987) ("In accordance with R.C. 3923.14 Mutual of Omaha clearly proved all five elements as a matter of law and, therefore, the trial court properly granted summary judgment in its favor" and rescinded the policy).

CCCU admits, and this Court agrees, that there are genuine issues of fact as to whether

any alleged false statements were "willfully false," whether they were "fraudulently made," whether they "materially affect[ed] either the acceptance of the risk or hazard" assumed by Defendants, whether CCCU induced EBT to provide coverage, and whether "but for" the alleged false statements CCCU would not have received coverage. (CCCU MSJ p. 17.) CCCU later asserts in its MSJ, however, that Defendants can never prevail on the issue of justifiable reliance because Wilson was provided with the 2005 Yearbook that clearly listed the name of each of CCCU's 399 ministers and was plainly told about CCCU's 200 churches, yet failed to question how it was that CCCU was seeking coverage for only 89 members. (*Id.* p. 19.)

A jury could find, nevertheless, that it was justifiable for CCCU to rely on the information that CCCU provided in its Application Agreement, especially as CCCU signed and agreed:

> We certify that we have read and agree to the above Participation Agreement and **understand that [EBT] will rely on this statement and all information set forth herein** as a basis for approving our organization's application for participation under the [trust].

(*Id.* p. 3, emphasis added.) Furthermore, it has not been shown that Defendants reviewed the Yearbook prior to issuing coverage. They may have, therefore, been unaware of its contents or its importance. Therefore, there is a genuine issue of material fact as to whether EBT justifiably relied on CCCU's representations in the Application Agreement. CCCU's motion for summary judgment on EBT's rescission claim is **DENIED**

### b. Fraud

The elements of a fraud claim under Ohio law are: (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to

whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying on it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998).

CCCU does not dispute elements two and six of EBT's prima facie case for fraud. The other four elements, however, are disputed.

### i. Representation or Duty to Disclose

The Application Agreement only requested disclosure of "full-time employees" and "part-time employees" and did not specifically request disclosure of the number of ministers in CCCU. The great majority of ministers were not considered by CCCU to be employees because they were not compensated by CCCU. There is a genuine issue of material fact as to whether CCCU should have disclosed the number of ministers associated with CCCU either in the full-time and part-time employee numbers, or whether CCCU should have separately written that there were a number of ministers it was not including in the full-time and part-time employee disclosures.

### ii. Made Falsely or with Utter Disregard as to Falsity; Intent to Mislead

There are also genuine issues of material fact as to whether CCCU had knowledge that the statements it made were false or were made with utter disregard and recklessness for their falsity, and whether CCCU had an intent to mislead.

According to CCCU, the numbers provided in its Application Agreement, 120 full-time employees and 30 part-time employees, are extremely close to the accurate number of persons actually employed by CCCU who receive compensation from CCCU. According to EBT, the

number of employees that CCCU should have disclosed were 196 full-time employees[6] and 282

part-time employees. These were the numbers revealed in an August 2007 audit of CCCU. These

numbers, however, were provided to EBT after EBT asked that the employee tabulations include

all employees of the individual churches. As previously analyzed, a jury could find that any

omission of ministers on the Application Agreement was simply because CCCU did not know or

understand that ministers should be included. A jury could also find, however, that CCCU knew

or should have known that the number of ministers should be disclosed in some way, and was

not forthright in its disclosures. There is, therefore, a genuine issue of material fact as to whether

CCCU knew the numbers were false or was reckless in providing the numbers of employees in

CCCU, so that knowledge of the numbers' falsity may be inferred. There is also a genuine issue

of material fact as to whether CCCU had an intent to mislead.

### iii. Justifiable Reliance

CCCU asserts that Wilson was provided with the 2005 Yearbook that clearly listed the

name of each of CCCU's 399 ministers and was plainly told about CCCU's 200 churches.

Therefore, CCCU contends, EBT cannot claim it justifiably relied on the assertion by CCCU that

it only had 120 full-time employees and 30 part-time employees. CCCU contends that EBT

should have known to ask questions, because it was apparent that CCCU and EBT were defining

"employees" differently. As previously analyzed, however, based on the language in the

Application Agreement, which stated that EBT "will rely on this statement and all information

set forth herein," and because it has not been shown that EBT actually reviewed the Yearbook

---

[6]This Court previously analyzed why, though the number of full-time employees revealed in the August 2007 audit is 196, the number of actual employees that needed to be disclosed as "eligible employees" was 115.

CCCU allegedly provided to EBT, a jury could find EBT justifiably relied on the information

provided in the Application Agreement.

For these reasons, CCCU's and EBT's motions for summary judgment on EBT's fraud

claim are **DENIED**.

### c. Breach of Contract

EBT's breach of contract claim is premised on CCCU's alleged breach of its promise in

the Application Agreement to "remit to the [Trust] monthly in advance the required monthly

employer/employee contribution for all persons who are eligible for benefits as described in the

[SPD] . . ." (Counterclaim ¶ 43 (citing Application Agreement p. 2).) EBT asserts that CCCU

grossly underreported the number of employees it had and failed to enroll many of its ministers,

all of which were eligible under the EBT plan regardless of full-time or part-time employment

status. EBT claims that these underreportings resulted in CCCU paying substantially less than

the required monthly contribution for all persons eligible for benefits under the plan, which was

in breach of contract.

A breach of contract occurs when a party demonstrates: (1) that a binding contract

existed; (2) that the nonbreaching party performed its contractual obligations; (3) that the other

party failed to fulfill its contractual obligations without legal excuse; and (4) that the

nonbreaching party suffered damages as a result of the breach. *Spectrum Benefit Options, Inc. v.

Med. Mut. of Ohio*, 880 N.E.2d 926, 934 (Ohio Ct. App. 2007).

CCCU argues that because it had no obligation to disclose the total number of ministers,

there was no breach of contract. As previously analyzed, there is a genuine issue of material fact

as to whether CCCU was obligated to disclose the total number of ministers in the Application

Agreement. If they were not obligated to report the ministers in its organization, then it would not be in breach of contract to not disclose those ministers.

This, however, is not what EBT's counterclaim avers was in breach of contract; rather, EBT's counterclaim avers that the contract was breached by failure to remit payments. The Application Agreement required CCCU to remit monthly contributions for all persons eligible for benefits as described in the SPD. (Application Agreement p. 2.) Pursuant to the SPD, Eligible Classes of persons include "employees" which are defined as including ministers, employees, and separate employees. (*Id*. p. 11.) Ministers are specifically defined to include any ministers who were under 65 years old and who were "active with a participating church entity, regardless of the source of his or her compensation." (*Id*.) Because CCCU did not receive the SPD prior to enrollment, its failure to disclose the number of ministers associated with CCCU may be excusable. Nevertheless, CCCU does not dispute that it later received the SPD, which described ministers as persons who are eligible for benefits, and the Application Agreement required monthly contributions for all persons eligible for benefits in the SPD. CCCU, therefore, did not submit the requisite monthly contributions because EBT based the contributions it collected on the information provided in the Application Agreement.

CCCU has asserted, however, a legal excuse for failure to remit the monthly contributions for all the eligible ministers, which is that EBT mislead CCCU and should therefore be equitably estopped from bringing a breach of contract claim. "Equitable estoppel precludes a party from asserting certain facts where the party, by his conduct, has induced another to change his position in good faith reliance upon that conduct." *State ex rel. Cities Serv. Oil Co. v. Orteca*, 409 N.E.2d 1018, 1020-21 (Ohio 1980). To establish a prima facie case for

application of equitable estoppel, a plaintiff must show: (1) the defendant made a factual misrepresentation, (2) that is misleading, (3) that induces actual reliance that is reasonable and in good faith, and (4) that causes detriment to the relying party. *Walworth v. BP Oil Co.*, 678 N.E.2d 959, 963 (Ohio Ct. App. 1996). The factual misrepresentation can arise by one's "acts, representations, or admissions, or by his silence when he ought to speak out." *State ex rel. Madden v. Windham Exempted Village School Dist. Bd. of Edn.*, 537 N.E.2d 646, 649 (Ohio 1989).

CCCU contends that EBT knew that problems existed with the information they received from CCCU, which is the information EBT was using to calculate the number of eligible employees for which CCCU had to submit contributions.[7] Despite this knowledge, CCCU complains that no one brought these questions to the attention of CCCU. By regularly invoicing and collecting monthly contributions of $45,000 to $55,000 from CCCU, EBT represented to CCCU that there were no problems with CCCU's participation in EBT. CCCU also contends that it was allowed to believe that in exchange for making monthly contributions, its claims would be paid.

Generally, "whether equitable estoppel is appropriate is a question of law and fact." *Andres v. Perrysburg*, 546 N.E.2d 1377, 1383 (1980). CCCU has established that EBT's silence and collection of payments caused detriment to CCCU. If CCCU had been informed that it did

---

[7]Tipton and Taylor claim they told Wilson, an agent of EBT, that they had some 300 ministers for which they were not seeking coverage and that there were 200 churches associated with CCCU.  (Tipton aff. ¶5; Taylor aff. ¶ 4.) It therefore should have been apparent to EBT, according to CCCU, that CCCU was not including the ministers at those churches in its employee tabulation. CCCU claims that because it did not understand it needed to include ministers, EBT, who knew that it wanted to have information about the ministers, should have questioned CCCU.

not qualify for the EBT plan or that its coverage was being terminated, it could have stopped making payments to EBT and sought coverage with another insurance company that would have covered its claims. CCCU has raised a genuine issue of material fact as to whether EBT's silence and collection of payments mislead CCCU to believe that it did not have to remit payments for ministers. There is also a genuine issue of material fact as to whether CCCU's reliance on EBT's silence and collection of payments was reasonable in light of the fact that the SPD stated that ministers were eligible employees.

Therefore, CCCU has established a prima facie case for application of equitable estoppel, which leaves the issue for a jury to decide. If equitable estoppel applies, EBT will be estopped from claiming that there were problems with CCCU's participation and that CCCU's contributions were insufficient for coverage. Because EBT's breach of contract claim is dependent on the equitable estoppel defense, both CCCU's and EBT's motions for summary judgment on EBT's breach of contract claim are **DENIED**.

## V. CONCLUSION

For the foregoing reasons, the Court: (1) **DENIES** Defendants' Motion to Strike Affidavits; (2) **DENIES** Defendants' Motion to Strike Unauthenticated Exhibits; (3) **DENIES** Defendants' Motion for Summary Judgment; and (4) **DENIES** Plaintiff's Motion for Summary Judgment.

**IT IS SO ORDERED.**

　　__s/ Algenon L. Marbley_____
**ALGENON L. MARBLEY**
**United States District Court Judge**

**DATE: July 15, 2009**